IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BERNITA LOUISE FRITZ,                          No. 3:16-cv-02238-HZ

                    Plaintiff,

        v.

NANCY A. BERRYHILL, Acting                     OPINION & ORDER
Commissioner of Social Security,

                    Defendant.


Merrill Schneider
SCHNEIDER KERR & ROBICHAUX
P.O. Box 14490
Portland, Oregon 97293

            Attorney for Plaintiff

Billy J. Williams
UNITED STATES ATTORNEY
District of Oregon
Janice E. Hebert
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

Alexis L. Toma
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104-7075

Attorneys for Defendant

HERNANDEZ, District Judge:

Plaintiff Bernita Fritz brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)). I affirm the Commissioner's decision.

PROCEDURAL BACKGROUND

Plaintiff applied for DIB and SSI on December 28, 2010, alleging an onset date of November 6, 2009. Tr. 188-95 (DIB); Tr. 196-01 (SSI). Her applications were denied initially and on reconsideration. Tr. 77-86, 97 (DIB, Initial); Tr. 87-96, 98 (SSI, Initial); Tr. 99-110, 123 (DIB, Reconsideration); Tr. 111-22, 124 (SSI, Reconsideration). On November 28, 2012, Plaintiff appeared, with counsel, for a hearing before an Administrative Law Judge (ALJ). Tr. 485-526. On January 24, 2013, the ALJ found Plaintiff not disabled. Tr. 13-25. The Appeals Council denied review. Tr. 1-3

Plaintiff appealed that decision to this Court. On May 13, 2015, Judge Marsh found that the ALJ had erred in several respects and remanded the case for further administrative proceedings. Tr. 559-81. The Appeals Council remanded the case to an ALJ in October 2015. Tr. 585. On July 12, 2016, a different ALJ held a new hearing at which Plaintiff appeared with

counsel.  Tr. 454-84.  On September 28, 2016, that ALJ found Plaintiff not disabled.  Tr. 432-53.

Plaintiff then filed a Complaint in this Court.

## FACTUAL BACKGROUND

Plaintiff alleges disability based on having bipolar disorder, high blood pressure, and high

cholesterol.  Tr. 217.  At the time of the July 2016 hearing, she was fifty-three years old.  Tr. 459.

She has a GED and has past relevant work experience as a nursing assistant and gas station

attendant.  Tr. 224, 478.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which . . . has lasted or can be

expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. §§

423(d)(1)(A), 1382c(3)(a).

Disability claims are evaluated according to a five-step procedure.  *See Valentine v.

Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step

procedure to determine disability).   The claimant bears the ultimate burden of proving disability.

*Id.*

In the first step, the Commissioner determines whether a claimant is engaged in

"substantial gainful activity."  If so, the claimant is not disabled.  *Bowen v. Yuckert*, 482 U.S.

137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner

determines whether the claimant has a "medically severe impairment or combination of

impairments."  *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the

claimant is not disabled.

In step three, the Commissioner determines whether plaintiff's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can perform past relevant work, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets his burden and proves that the claimant is able to perform other work which exists in the national economy, the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. Tr. 437. Next, at step two, the ALJ determined that Plaintiff has severe impairments of obesity, respiratory disorders described as asthma and COPD, and mental health conditions described as bipolar disorder and alcohol dependence. Tr. 437-38. However, at step three, the ALJ determined that Plaintiff's impairments did not meet or equal, either singly or in combination, a listed impairment. Tr. 438-40.

At step four, the ALJ concluded that Plaintiff has the RFC to perform light work as

defined in 20 C.F.R. §§ 404.1567(b), 416.927(b), except that she can lift and carry ten pounds frequently and twenty pounds occasionally, she can stand or walk up to six hours in an eight-hour workday with normal breaks, and she has no limit on her ability to sit.  Tr. 440.  She is also limited to no climbing of ladders, ropes, or scaffolds, she should avoid exposure to extremes of cold, she should avoid exposure to respiratory irritants such as fumes, odors, dust, and gasses, and she should not work around hazards such as unprotected heights and dangerous machinery. *Id.*  Further, the ALJ restricted her to remembering, understanding, and carrying out tasks or instructions consistent with occupations which have a significant vocational preparation (SVP) of 1- 2.  *Id.*  Additionally, she should have no interaction with the general public, which the ALJ explained meant that while she could walk by the general public, she should not be performing tasks involving "real verbal communication[.]"  *Id.*  Finally, the ALJ stated that while Plaintiff could work in proximity to coworkers, she would do best performing tasks that do not require teamwork.  *Id.*

With this RFC, the ALJ determined that Plaintiff is unable to perform any of her past relevant work.  Tr. 445.  However, at step five, the ALJ determined that Plaintiff is able to perform jobs that exist in significant numbers in the economy such as laundry worker and electronics worker.  Tr. 446.  Thus, the ALJ determined that Plaintiff is not disabled.  *Id.*

STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal

quotation marks omitted). The court considers the record as a whole, including both the

evidence that supports and detracts from the Commissioner's decision. *Id.*; *Lingenfelter v.

Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than

one rational interpretation, the ALJ's decision must be affirmed." *Vasquez*, 572 F.3d at 591

(internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149,

1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the

court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

DISCUSSION

In her Opening Memorandum, Plaintiff contends that the ALJ erred by (1) improperly

finding her subjective testimony not credible; (2) improperly rejecting lay opinion testimony; and

(3) improperly considering medical opinions. ECF 14. In her Reply Memorandum, she suggests

that the ALJ further erred in assessing Plaintiff's concentration abilities and in regard to her

physical impairments. ECF 17.

I. Plaintiff's Credibility

The ALJ is responsible for determining credibility. *Vasquez*, 572 F.3d at 591. Once a

claimant shows an underlying impairment and a causal relationship between the impairment and

some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony

if there is no evidence of malingering. *Carmickle v. Comm'r*, 533 F.3d 1155, 1160 (9th Cir.

2008) (absent affirmative evidence that the plaintiff is malingering, "where the record includes

objective medical evidence establishing that the claimant suffers from an impairment that could

reasonably produce the symptoms of which he complains, an adverse credibility finding must be

based on 'clear and convincing reasons'"); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (ALJ engages in two-step analysis to determine credibility:  First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged"; and second, if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give "specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms.") (internal quotation marks omitted).

When determining the credibility of a plaintiff's complaints of pain or other limitations, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence.  *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).  The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain.  *Id.*; *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) ("The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.") (internal quotation marks omitted).

As the Ninth Circuit explained in *Molina*;

In evaluating the claimant's testimony, the ALJ may use ordinary techniques of credibility evaluation.  For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct,

unexplained or inadequately explained failure to seek treatment or to follow a
prescribed course of treatment, and whether the claimant engages in daily
activities inconsistent with the alleged symptoms[.] While a claimant need not
vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit
a claimant's testimony when the claimant reports participation in everyday
activities indicating capacities that are transferable to a work setting[.] Even
where those activities suggest some difficulty functioning, they may be grounds
for discrediting the claimant's testimony to the extent that they contradict claims
of a totally debilitating impairment.

*Molina*, 674 F.3d at 1112-13 (citations and internal quotation marks omitted).

The ALJ noted Plaintiff's allegations that she is unable to work due to bipolar disorder

and shortness of breath. Tr. 441. The ALJ also cited to Plaintiff's testimony that she has

difficulty functioning outside of her home because she is nervous, paranoid, and scared of other

people. *Id.* The ALJ further noted that Plaintiff reported having difficulty with memory,

concentration, and following instructions. *Id.*

The ALJ applied the two-step credibility analysis, finding first that Plaintiff's medically

determinable impairments could reasonably be expected to cause her alleged symptoms. *Id.*

However, the ALJ then found that Plaintiff's statements regarding the intensity, persistence, and

limiting effects of her symptoms were not "entirely consistent with the medical evidence and

other evidence in the record for the reasons explained in this decision." *Id.*

From there, the ALJ is somewhat unclear in setting out her reasoning. It appears that she

provided the following reasons in support of her credibility determination: (1) the objective

evidence and treatment history did not support Plaintiff's testimony that she was incapable of

performing work at the light exertional level with "other nonexertional limitations"; (2) she has

received routine and conservative treatment for her asthma and COPD; (3) her asthma and COPD

symptoms are managed with treatment; (4) her allegation of disabling asthma and COPD is

undermined by her continuing to smoke up to a pack of cigarettes each day; (5) her bipolar symptoms have been well-controlled with medication since her alleged onset date; (6) she rarely saw her primary care provider; and (7) her activities of daily living are "somewhat less limited" than would be expected given her allegations of disabling symptoms and limitations. Tr. 441-44.

Plaintiff argues that the ALJ erred in her credibility determination by finding that her bipolar disease was controlled with medication and by finding that her activities were inconsistent with her allegations and demonstrated an ability to perform full-time work.

A. Bipolar Disorder

 In his May 2015 Opinion, Judge Marsh concluded that the prior ALJ erred in rejecting the opinion of a nonexamining physician. Tr. 567. The prior ALJ had determined that the record did not demonstrate a deterioration in Plaintiff's mental functioning since she was fired from a gas station attendant job. Tr. 24, 567. Judge Marsh cited three instances he concluded contradicted the ALJ's finding. Tr. 567-68. Judge Marsh also explained that "occasional treatment notes documenting improvement and stability do not entirely negate plaintiff's functional limitations from her bipolar disorder." Tr. 568. He relied on a 2014 Ninth Circuit case to explain that "'[t]he very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so that any single notation that a patient is feeling better or has a good day does not imply that the condition has been treated.'" *Id.* (quoting *Garrison v. Colvin*, 759 F.3d 995, 1017 n.23 (9th Cir. 2014)).

Plaintiff argues that Judge Marsh's conclusion is a "finding" that "plaintiff's treatment was consistent with her diagnosis of bipolar disorder[.]" Pl.'s Op. Mem. 9. Based on this, Plaintiff suggests that the current ALJ "ignored" Judge Marsh's Opinion. I disagree. Judge Marsh's

Opinion appropriately recognized the symptom variability of a disease such as bipolar disorder. He indicated that given the nature of the disease, an ALJ may not rely on isolated instances of a "good day" to conclude that the claimant does not experience the symptoms the claimant alleges. He did not make a finding that her ongoing treatment was consistent with her disorder.

In support of her September 2016 determination that Plaintiff's bipolar disorder symptoms have been "relatively well controlled with medication since the alleged onset date" of November 2009, the ALJ cited to a variety of medical records indicating that Plaintiff was relatively stable on medication. Tr. 442-43. First, the ALJ cited to a July 2009 psychiatrist's report that Plaintiff had a few short periods of depression but was otherwise relatively stable on medication. Tr. 442 (citing Tr. 339). At that time, Plaintiff was a patient at Cascadia Behavioral Healthcare where she had been seen for at least one year. Tr. 301-49. A review of the Cascadia chart notes from September 2008 to August 2009 shows that the July 2009 statement by the psychiatrist that Plaintiff was stable on medication was not an isolated day or period. In fact, during the time she was a patient there, she was noted several times to be stable on her medications. *E.g.*, Tr. 329 (Sept. 12, 2008 progress note stating she was medication adherent, mood was stable without clear depressive, manic, mixed, or hypomanic episodes, she had no self-destructive thoughts); Tr. 332 (Nov. 21, 2008 progress note making the same observations); Tr. 334 (Jan. 16, 2009 chart note making the same observations plus adding that there were no abnormalities present during her mental status examination); Tr. 312-15 (Jan.-Feb. 2009 annual mental health assessment noting that Plaintiff's speech and tone were appropriate, her attitude was unremarkable, her mood and affect were congruent and euthymic, she was oriented to person, place, time, and circumstances, her thought processes were goal directed and content was

unremarkable, her depression was generally controlled, and at times she presented with anxious symptoms of "more pressured speech" and "agitated" body movement); Tr. 320 (Fe. 26, 2009 clinical progress note stating that Plaintiff reported she was doing "fine" managing her mood with her medications); Tr. 324 (July 6, 2009 clinical progress note stating that Plaintiff reported she "feels good").

While she was a patient at Cascadia, her medications were initially Lithium and Zyprexa. Tr. 330 (Sept. 12, 2008). In November 2008, the Zyprexa was discontinued because of metabolic concerns and Abilify was substituted. Tr. 33. She then continued on Lithium and Abilify for several months. Tr. 336 (Jan. 2009); Tr. 338 (April 2009). In late April 2009, she told her mental health counselor that she had stopped taking Abilify because it was too expensive. Tr. 323. Nonetheless, as noted above, in July 2009 her psychiatrist stated she was stable on her medications. Tr. 339. Plaintiff's alleged onset date is November 2009, and the Cascadia records precede that date. Reviewing them, however, shows that the ALJ did not mischaracterize the record by citing to the July 2009 Cascadia psychiatrist's note for the proposition that at the time, she was "relatively stable on medication."

Next, the ALJ acknowledged that in September 2009, still before Plaintiff's alleged onset date, Plaintiff had a flare-up of her bipolar symptoms and was restarted on Zyprexa. Tr. 442 (citing Tr. 387). It is unclear when Plaintiff resumed taking Zyprexa after stopping it in November 2008. In July 2009 when she began seeing Dr. Stephanie Cha, M.D., after losing eligibility to continue treatment with Cascadia, there is no indication she was taking Zyprexa. Tr. 384-86. Still, at that time Plaintiff told Dr. Cha that she had been a patient at Cascadia and her mood had been stable. Tr. 384.

On September 17, 2009, Plaintiff told Dr. Cha that she had discontinued Zyprexa because of symptoms of increased thirst and frequent urination. Tr. 387. Dr. Cha noted that Plaintiff reported she was not sleeping much and was paranoid that her co-workers were spying on her. *Id.* She had passive suicide thoughts but no active thoughts. *Id.* The chart note indicates Plaintiff was still working as a gas station attendant at the time. *Id.* Dr. Cha indicated that this was a "flare" of her bipolar disorder and ordered her to restart Zyprexa. Tr. 388. By the next week, Plaintiff was feeling better. Tr. 377-78. Dr. Cha noted that Plaintiff's affect was flat but she had a linear thought process. *Id.* Plaintiff then remained stable on Lithium and Zyprexa for the next year. Tr. 365-66 (Jan. 5, 2010 chart note stating that Plaintiff "feels like she is doing well," had no suicidal ideation, had decreased anxiety and paranoia, and was stabilized on Lithium and Zyprexa); Tr. 357 (July 29, 2010 chart note stating she was "quite stable" on Lithium and Zyprexa); Tr. 350-51 (Oct. 29, 2010 chart note stating she was doing well and was stable on current regimen of Lithium and Zyprexa). The ALJ did not mischaracterize Dr. Cha's chart notes. Her interpretation that Plaintiff's discontinuing of Zyprexa caused the September 2009 flare of symptoms was reasonable.

Next, the ALJ summarized chart notes from 2010 to April 2014, noting that Plaintiff did not see a mental health specialist regularly and received her medication management from her primary care physician instead. Tr. 442. The ALJ explained that Plaintiff remained on essentially the same combination of Lithium and Zyprexa she had been prescribed starting in 2009. *Id.* She did not complain of significant problems with paranoia or mood instability. Tr. 443. According to the ALJ, treatment notes show her medication effectively managing her bipolar symptoms. *Id.*

Again, the ALJ did not refer to isolated instances of improvement.  Instead, the chart notes from Plaintiff's primary care provider during this time period show her continued stability on Lithium and Zyprexa with no exacerbation of bipolar disorder symptoms.  In addition to the 2010 records described above, Dr. Cha noted in January 2011 that Plaintiff's mood was stable on these two medications, she was calm, and she made good eye contact.  Tr. 400-02 (stating further that Plaintiff's bipolar disorder was stable); *see also* Tr. 424 (Jan. 4, 2012 "annual visit"; noting she was calm, made good eye contact, and was stable on Lithium and Zyprexa); Tr. 416-18 (Oct. 31, 2012 chart note of visit for concern over a skin issue but noting that Plaintiff reported "otherwise doing well").  In fact, in April 2013, not only was she doing well, Plaintiff reported "doing great with her mood," "feeling great" and denying any paranoia or significant mood variability.  Tr. 729.

Finally, still in regard to the bipolar disorder, the ALJ noted that in April 2014, Plaintiff's primary care provider referred Plaintiff to a mental health clinic for medication management and that the treatment notes from that time continuing into 2016 showed her symptoms to be stable, with occasional waxing and waning of symptoms, most often due to situational stressors.  Tr. 443.  A review of the seventy-two pages of progress notes from Cascadia, the mental health clinic Plaintiff returned to in 2014, confirms that the ALJ's assessment of the record was reasonable and did not rely on isolated "cherry-picked" instances of stability to support her finding that Plaintiff's bipolar disorder was stable on medication.

In her April 2014 mental health assessment, Plaintiff reported being there mainly for medication and stating that her bipolar symptoms had been "pretty well controlled on medication." Tr. 737.  She stated that she experienced manic highs and eventual depression

when *off* her medication.  *Id.*  She was taking Lithium and Zyprexa.  Tr. 738.  She stated she had had no hospitalizations for the previous five or six years, meaning since 2008 or 2009.  Tr. 737.  The last time was while she was unmedicated and drinking alcohol.  Tr. 745.

In the Cascadia psychiatric assessment from May 2014, she was assessed as "currently stable without suicidal ideations, depression, or mania."  Tr. 760.  She described her mood as having been "pretty good" and "even."  Tr. 761.  She also said her medications were "working really well."  Tr. 762.  Her mood was noted to be "stable" and "even," with a euthymic affect.  Tr. 764.  She had "occasional fleeting nighttime visual hallucinations" with no other signs of psychosis.  *Id.*  She and the practitioner discussed the option of an as-needed medication for the management of "rare exacerbation of symptoms" but it was deferred.  Tr. 761.

Plaintiff had another mental health assessment in April 2015.  In between the one in April 2014 and the next one in April 2015, she had occasional individual sessions with Alexandrea Masloski or Meredith Arend, mental health counselors at Cascadia.  Tr. 765-77.  Plaintiff was stable on her medications for several months.  Tr. 765 (May 13, 2014: "Client reports being extremely stable on the medication she is taking now"); Tr. 766 (June 4, 2014: "Client reports that her overall mood has been good" and "being extremely stable on the medication she is taking now"); Tr. 768 (July 15, 2013:  she reported that "[t]hings are going pretty well" and "continues to be well, is happy with her medication[.]").

In December 2014, she reported feeling "[p]retty good, not depressed[.]" Tr. 770.  However, she expressed feeling a lot of anxiety which appears related to stress over continued interpersonal conflict in her familial relationships.  *Id.*  During the session, she became more relaxed and was able, with the help of her counselor, to identify several coping skills and

strategies for managing her feelings.  *Id.*  One month later, in January 2015, she reported that her symptoms had been well managed since the last session, even though she was facing financial stressors.  Tr. 772.  And, in February 2015, she stated that things had been stressful but, the counselor noted, she "does not report an increase in symptoms and is maintaining her baseline."  Tr. 774.

In her April 2015 updated mental health assessment, Plaintiff reported her symptoms of depression and mania were "at baseline" and experiencing "just a little bit of weepiness."  Tt. 744.  She also reported having a euthymic mood, even though her affect was flat during her session.  Tr. 747.  Additionally, she "reported no increase in bipolar symptoms in the last year."  Tr. 749.  A few weeks later, at her individual session with counselor Arend, Plaintiff reported that she was "fine," "less tearful," and had mood stability.  Tr. 780.  For the next year, she regularly reported that her mood was "fine" or "good" despite confronting stressors such as family, loneliness, and housing challenges.  Tr. 782 (May 28, 2015); Tr. 784 (July 21, 2015); Tr. 789 (Sept. 17, 2015 ); Tr. 802 (Feb. 11, 2016); *see also* Tr. 793 (Oct. 15, 2015: "Client reports symptoms at baseline").

At one point in November 2015, she presented with symptoms of increased anxiety and discussed her worries over her sons.  Tr. 795.  She and her counselor discussed coping skills and strategies.  *Id.*  She continued to express interpersonal distress a couple of weeks later.  Tr. 797.  Her counselor helped her problem solve and decide on a course of action regarding the distressing interpersonal interactions.  *Id.*  However, by December she was reporting her symptoms at baseline and by early January, said her mood had been fine, she was good, her moods were stable, and she had no increase in anxiety.  Tr. 798, 800.

At her March 2016 annual mental health assessment, Plaintiff reported her symptoms at baseline and that her medications had been effectively managing her symptoms, even though she continued to occasionally experience anxiety and depressive symptoms. Tr. 752, 758. She was noted to be stable on her medications. Tr. 753. She reported a euthymic mood. Tr. 756; *see also* Tr. 806 (March 17, 2016 Individual Service Plan noting Plaintiff reported no increase in symptoms in twelve month period).

The ALJ's finding that the records of Plaintiff treatment at Cascadia between April 2014 and March 2016 showed overall stability in her mental symptoms, is supported by the record. It was accurate to describe the records as showing that her symptoms were most often reported to be stable while experiencing some ups and downs due to situational stressors and interpersonal relationship issues. The ALJ did not single out isolated instances of improvement. Instead, the ALJ properly found that Plaintiff remained stable on her medications.

As this lengthy discussion of the record shows, Plaintiff began taking Lithium and Zyprexa in 2009. Despite some relatively slight fluctuations in mood between 2009 and 2016, Plaintiff's bipolar disorder symptoms have been effectively stabilized on these medications. One instance described by Dr. Cha as a "flare" is attributable to Plaintiff's discontinuation of Zyprexa. Later, while she experienced occasional increases in anxiety or tearfulness related to situational stressors, she worked with her counselor on coping strategies and she continued to report her symptoms at baseline. The ALJ did not err in finding Plaintiff's subjective testimony not credible because her bipolar disorder was effectively treated and its symptoms managed with medication.

B. Activities of Daily Living

In support of her negative credibility determination, the ALJ also found that Plaintiff's

activities of daily living were "somewhat less limited than would be expected given her allegations of disabling symptoms and limitations." Tr. 443. The ALJ noted Plaintiff's regular walking for exercise and a 2014 reference to her exercising at a moderate to strenuous level for 150-210 minutes per week which the ALJ found to be inconsistent with the extent of Plaintiff's alleged limitations from shortness of breath. Tr. 444. Next, the ALJ noted that Plaintiff spent time socially with friends and reconnecting with an estranged child. *Id.* This was "somewhat inconsistent" with her allegations of being "essentially unable to sustain or tolerate the level of social contact required for competitive employment." *Id.* Finally, the ALJ cited to Plaintiff's enjoyment of cooking and baking, and her activities of housework and meal preparation without significant limitation, her ability to drive, shop in stores, manage her own money, enjoyment of books and magazines, and her use of public transportation. *Id.* All of these activities were "generally inconsistent" with Plaintiff's alleged limitations. *Id.*

Plaintiff argues that her activities do not contradict her allegations because she never alleged she was "totally incapacitated" and she "readily acknowledged" performing limited household chores, checking the mail, watching television, doing laundry, preparing a simple meal, taking her medications, and occasionally talking to a neighbor. Pl. Op. Mem. 8. Defendant contends that there are specific inconsistences between her testimony and her activities and that the ALJ's determination was proper.

At the July 12, 2016 hearing, Plaintiff testified that she was unable to work because she gets anxious and nervous and has to take lots of breaks because she gets out of breath very easily. Tr. 469. She explained that people make her anxious and scare her, which leads to poor decision making. *Id.* At her previous hearing in 2012, she testified that she could not return to her prior

work as a gas station attendant because she could not "keep up." Tr. 511. The ALJ noted that for

that particular job, Plaintiff did not testify she lost the job because she was injured or had a

breakdown but because she was blamed for something she claimed was not her fault. *Id.* The

ALJ wondered then, what had changed since Plaintiff lost that job that now prevented her from

performing it. *Id.* Plaintiff responded "[p]hysically[,] but she was unable to identify what had

changed. Tr. 511-12. Upon questioning from her counsel, she stated that she could likely not

perform a job cleaning a hotel room, where she would be away from people, because she could

not keep up due to her shortness of breath. Tr. 522. She also testified that she has problems

concentrating which makes reading difficult. *Id.* She noted that she panic attacks. *Id.* Further,

she explained that she gets anxious around people. Tr. 522-23.

The ALJ's finding that Plaintiff's daily activities are somewhat inconsistent with her

testimony is supported by the record. First, Plaintiff's testimony is reasonably construed as

stating that she has disabling shortness of breath, preventing her from working. As the ALJ

noted, however, her testimony that she walks daily and evidence showing she reported exercising

at a moderate to strenuous level for 150-210 minutes per week contradicts her assertion that her

shortness of breath prevents her from working.

Second, the ALJ reasonably understood Plaintiff's testimony to be that she cannot work

because she cannot tolerate being around people without getting anxious. The ALJ reasonably

found this assertion to be somewhat inconsistent with her spending time socially with friends and

reestablishing her relationship with her estranged son.

Third, the ALJ cited to a number of other activities that Plaintiff engaged in and found

them inconsistent with her limitations. While Plaintiff is correct that she "readily acknowledged"

engaging in several activities, that does not make them consistent with the thrust of her testimony that her shortness of breath, bipolar symptoms, anxiety, or allegedly impaired concentration render her unable to work. As the ALJ noted, she reads books and magazines which undermines her allegations about limited concentration. She uses public transportation and shops in stores which undermines her testimony that she experiences disabling paranoia or anxiety when she is around people.

The ALJ did not err in concluding that Plaintiff's activities of daily living contradicted her allegations that she cannot work.

II. Physical Impairments

In her Response Memorandum, Defendant argues that Plaintiff did not challenge the ALJ's finding that Plaintiff was less physically limited than she alleged and has thus waived the opportunity to raise that argument. In her Reply Memorandum, Plaintiff contends that her Opening Memorandum's arguments about Judge Marsh's Opinion sufficiently raised the issue that the ALJ made some unspecified error in assessing her physical impairments.

For the purposes of this Opinion, I assume Plaintiff sufficiently raised the error. But, I conclude that the ALJ's determination was supported by substantial evidence in the record. At step two, the ALJ found that Plaintiff had severe impairments of "respiratory disorders described as asthma, and COPD[.]" Tr. 437. However, in determining the RFC at step four, the ALJ concluded that these conditions did not limit Plaintiff as severely as she alleged. Tr. 441-42. The ALJ noted that in Plaintiff's Adult Disability Report and Adult Function Report, she did not report symptoms of shortness of breath. Tr. 441 (citing Tr. 216-23, Tr. 232-39). In October 2010, she denied having a history of asthma and COPD at a primary care appointment. *Id.*

(citing Tr. 350). Plaintiff reported walking twenty to thirty minutes a day without reports of significant or persistent difficulties from shortness of breath from this activity. *Id.* (citing *e.g.*, Tr. 406, 745). The ALJ noted that Plaintiff complained of shortness of breath in January 2012 but did not seek additional evaluation or treatment for this until 2014. *Id.* (citing Tr. 424). While the record showed Plaintiff was assessed as having asthma and COPD in 2014, the ALJ noted that Plaintiff had received routine and conservative treatment. *Id.* (further noting her testimony that treatment had helped manage her symptoms). Additionally, she had required no emergency treatment. *Id.* Moreover, she smoked up to a pack of cigarettes each day which, according to the ALJ, suggested that Plaintiff's shortness of breath was less limiting than she alleged. Tr. 442.

Although Plaintiff points to other evidence in the record in support of her position, Plaintiff does not contend that the ALJ erroneously recited the evidence. Given the step two finding of severity and the lack of any alleged error by the ALJ in her description of the evidence, Plaintiff's argument must be that the ALJ's determination and consideration of the evidence is unreasonable. I disagree. The ALJ's interpretation of the record, beginning with Plaintiff's failure to initially cite to breathing issues, the lack of diagnosis or report of problems until 2014, and the conservative and effective treatment, combined with her continued cigarette use, was reasonable. While the record may be susceptible to a different interpretation, I must affirm the ALJ when the ALJ's interpretation is rationally based on the record. It is so here.

III. Concentration

At step three, the ALJ determined that Plaintiff had moderate difficulties in concentration, persistence, and pace. Tr. 439. She noted Plaintiff's report of problems with memory, concentration, and following instructions. *Id.* The ALJ cited to the February 2011 report by

examining psychologist Jane Starbird, Ph.D. *Id.* (citing Tr. 404-08). The ALJ noted Dr. Starbird's findings that Plaintiff quickly gave up with a serial counting exercise, and in a concentration measurement exercise she could not or would not spell "world" backwards. *Id.* However, the ALJ stated that Dr. Starbird reported that Plaintiff's recall was intact and she could perform simple calculations. *Id.* The ALJ then cited to other mental status examinations which did not show that Plaintiff's mental symptoms significantly or persistently interfered with Plaintiff's attention, concentration, or memory. *Id.* (citing Tr. 315, 747-48). The ALJ further relied on the opinions of the two state agency mental health consultants who found Plaintiff moderately limited in this area of functioning. *Id.* (citing Tr. 77-86, 99-110). Based on this evidence, the ALJ concluded at step three that Plaintiff had a moderate limitation in concentration, persistence, and pace.

At step four, the ALJ's RFC included the limitation that Plaintiff could remember, understand, and carry out tasks or instructions consistent with occupations of SVP 1 or 2. Tr. 440. In support of this limitation, the ALJ again relied on Dr. Starbird's report, and added that Dr. Starbird also concluded that Plaintiff could manage her own funds. Tr. 443. *Id.* The ALJ interpreted Dr. Starbird's report as supporting the limitation to "simple work[.]" *Id.* SVP 1-2 corresponds to unskilled work. *See* Soc. Sec. Ruling (SSR) 00-4p ("unskilled work corresponds to an SVP of 1-2"), available at 2000 WL 1898704. Unskilled work is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. §§ 404.1568(a), 416.968(a). The ALJ also cited to mental status examinations from Cascadia which did not show any significant problems with attention, concentration, or memory. *Id.* (citing 747, 756). She noted that Plaintiff rarely complained of concentration

problems.  *Id.*  The ALJ further cited to the opinions of the state agency consultants.  *Id.* (citing Tr. 77-86, 99-110).  The ALJ then endorsed the portion of the opinion given by Plaintiff's psychiatric nurse practitioner in 2015, that Plaintiff had mild limitations in concentration, persistence, or pace.  Tr. 444-45 (citing Tr. 853-57).  The ALJ explained that this opinion was consistent with the lack of observations of problems with attention, concentration, or memory.  Tr. 445.

Plaintiff cites to Dr. Starbird's report in support of her argument that Plaintiff's concentration is impaired.  Pl.'s Reply 3-4.  In her report, Dr. Starbird noted that Plaintiff's concentration was "variable, at times poor."  Tr. 406.  However, as the ALJ noted, Dr. Starbird found that Plaintiff's recall was intact, she could perform simple calculations, and she could manage her own funds.  Tr. 443.

Dr. Starbird's statement that Plaintiff's concentration was variable and poor at times does not establish that the ALJ erred in concluding that Plaintiff had moderate limitations and that Plaintiff's limitations were sufficiently addressed in the RFC limiting her to SVP 1 or 2 jobs.  The statement provides no basis for evaluating what Dr. Starbird meant by "poor," or notably, quantifying the percentage of time meant by "at times."  When viewed along with the other evidence cited and discussed by the ALJ regarding Plaintiff's concentration, the ALJ's determination is supported by substantial evidence in the record as a whole.

## IV.  Lay Opinion Testimony

David Yegge submitted a Third-Party Function Report, dated January 22, 2010, in support of Plaintiff's disability application.  Tr. 240-48.  He identified himself as the manager of a store where Plaintiff used to work and said he had known her over ten years.  Tr. 240.  He

stated that Plaintiff was unable to run the cash register or keep up with the customer volume while working. *Id.* He indicated she had no problems with personal care, did not know if she needed reminders for personal needs or grooming because he did not live with her, and because he had watched her go through "cycles" over the years, he was not convinced she regularly took her medication. Tr. 240-41. She prepared her own meals and cooked food or meals daily to weekly. Tr. 241. Her home was orderly but somewhat dirty. *Id.* She could drive a car, go out alone, and count change. Tr. 243. He did not believe she was able to pay bills, handle a savings account, or use a checkbook or money orders. *Id.* According to Yegge, Plaintiff watched a lot of television, she was not involved with many people or functions, and was paranoid about strangers and neighbors. Tr. 244. He believed she had trouble completing tasks, following instructions, getting along with others, and in concentrating. Tr. 245. He noted that her thoughts were somewhat scattered and she can pay attention for a short time. *Id.* But, she could follow written instructions "pretty good," and she finishes what she starts, such as a conversation, chores, reading, or watching a movie. *Id.* He indicated she had been fired from a previous job because she did not get along with most of the crew. *Id.*

"Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's ability to work is competent evidence that the ALJ must take into account." *Molina*, 674 F.3d at 1114. The ALJ must give reasons "germane to the witness" when discounting the testimony of lay witnesses. *Valentine*, 574 F.3d at 694.

The ALJ gave little weight to Yegge's statement. Like the previous ALJ, the ALJ in September 2016 mistakenly referred to Yegge as Plaintiff's boyfriend. Tr. 445, 574-57. Furthermore, the ALJ suggested that because Yegge was not an acceptable medical source, "his

observations of symptoms and limitations is not entirely reliable." Tr. 445. She continued, however, by further explaining that Yegge's description of Plaintiff's "symptoms and limitations is inconsistent with evidence of improvement in bipolar symptoms, and the claimant's activities of daily living, including, but not limited to, maintaining interpersonal relationships, doing housework, preparing meals, and managing personal finances." *Id.*

Plaintiff argues that the ALJ's rejection of Yegge's opinion was improper. She initially suggests that Judge Marsh previously concluded that the misidentification error was not harmless. As such, the same conclusion should be reached here. Plaintiff's description of Judge Marsh's conclusion is incomplete. Judge Marsh noted that the Commissioner conceded that the ALJ erred in misidentifying Yegge. Tr. 574. He then proceeded to determine if the error was harmless. The Commissioner argued that because the ALJ nonetheless provided a germane reason to reject Yegge's testimony unrelated to the misidentification error, the misidentification error was harmless. Tr. 574-75. In the prior January 2013 opinion, the ALJ had rejected Yegge's opinion because his statement that Plaintiff could not keep up the work was contrary to her ongoing work activity which ended only due to problems with equipment. Tr. 24. Judge Marsh concluded that Yegge's testimony about Plaintiff's work pace was consistent with the record and not contrary to it. Tr. 575. Thus, because no other reasons were given, the prior ALJ had failed to provide any germane reason in support of his rejection of Yegge's testimony. As a result, the errors by the prior ALJ in assessing the lay testimony were not harmless. *Id.* As can be seen from reading Judge Marsh's Opinion, the misidentification of Yegge was not itself harmful error. The lack of any germane reason meant that the ALJ's error was not harmless.

Here, Defendant again concedes that the ALJ erred in misidentifying Yegge as Plaintiff's

boyfriend. And, Defendant indicates she does not rely on the language regarding Yegge not being an acceptable medical source. Def.'s Brief 12 n.2, ECF 16. However, Defendant contends that the ALJ still provided two germane reasons to reject Yegge's testimony. Plaintiff argues that the record does not support the ALJ's findings.

The ALJ found that Yegge's statement, given in early 2010, was inconsistent with the evidence showing improvement in Plaintiff's bipolar symptoms. Tr. 445. An ALJ may reject a lay statement that is inconsistent with medical evidence. *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). Plaintiff argues that her bipolar syndrome did not improve but fluctuated and that she continued to have limits related to her bipolar disorder. For the reasons explained above, the record supports the ALJ's determination that Plaintiff's bipolar symptoms were stable on medication since her alleged November 2009 onset date. Thus, Yegge's statements that Plaintiff went through "cycles" and experienced limitations in other daily tasks or interactions was contradicted by the record showing her bipolar symptoms to be stable.

The ALJ also found that Yegge's statement was contradicted by several of Plaintiff's activities. Yegge's statement about Plaintiff's inability to pay bills or handle a savings of checking account is contradicted by her ability to independently manage her funds as assessed by the examining psychologist. Plaintiff herself noted that she *was* able to pay bills and while she said she could not use a checking account, the reason she gave was that she gets overdrawn, not that she did not understand how checking accounts work. Tr. 236. Although Yegge stated she does not spend time with others, Plaintiff herself states in her Reply Memorandum that she has two to three friends. Pl. Reply. 6. The record also shows that she not only has friends, she spends time with them. *E.g.*, Tr. 406 ("She has friends, in particular 2 female friends with whom

she spends time"); Tr. 521 (describing at Nov. 28, 2012 hearing that she had friends with whom she sat around, talked, watched television, and watched movies); Tr. 730 (drinks with friends on weekends); Tr. 738 (stating she has three friends in her apartment complex she has known for five years); *see also* Tr. 468 (visits with the people at Rite-Aid when she goes there every day). Plaintiff's reports to her treating and examining practitioners contradicts Yegge's statements about her inability to spend time with others.

The ALJ provided reasons germane to the witness in support of her rejection of Yegge's testimony. As a result, her errors in misidentifying Yegge as Plaintiff's boyfriend and in discounting his testimony because he was not an acceptable medical source are harmless.

V. Medical Practitioner Opinions

Plaintiff challenges the ALJ's assessment, or lack thereof, of medical evidence from Dr. Ronald Cafferky, M.D., and Arend, her treating mental health therapist at Cascadia.

A. Dr. Cafferky

Dr. Cafferky saw Plaintiff when Plaintiff was a psychiatric inpatient at Portland Adventist Medical Center in January 2008, before her alleged onset date. Tr. 280-300. During her several-day stay there, Dr. Cafferky gave Plaintiff a Global Assessment of Functioning (GAF) score of 30. Tr. 288 (Jan 10, 2008 - GAF 30); Tr. 282 (Jan. 11, 2008 - GAF 30). Plaintiff notes that these scores are consistent with the GAF score of 35 given in 2009 by Cascadia mental health counselor Alaina Lipp. Tr. 306.

Plaintiff argues that although the ALJ noted higher GAF scores of 55 and 60, she did not consider the lower scores assessed by Dr. Cafferky. Plaintiff argues that this was error because the ALJ is required to consider all medical opinion evidence in the record and cannot disregard

uncontroverted medical opinion without stating clear and convincing reasons for doing so.

Defendant argues that the ALJ does not need to discuss all evidence presented but need explain

only why "'significant probative evidence has been rejected.'" Def. Brief. 17 (quoting *Vincent v.*

*Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984)). Defendant argues that the GAF scores

reflected subjective complaints, do not constitute an opinion on functional capacity, and were

neither significant nor probative of Plaintiff's disability as of November 2009. Therefore, the

ALJ committed no error. And, Defendant contends, any error in not specifically rejecting these

scores was harmless.

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted

opinion of either a treating or examining physician. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.

1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can

only be rejected for specific and legitimate reasons that are supported by substantial evidence in

the record." *Id.* at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him

or her. *Vincent*, 739 F.2d at 1394-95. The ALJ must only explain why "significant probative

evidence has been rejected." *Id.*

Dr. Cafferky's GAF score assessment occurred during a single hospital admission, almost

two years before Plaintiff's alleged onset date. Then, before her discharge a couple of days later,

her GAF score improved to 55. Tr. 280 (Jan. 13, 2008 hospital discharge summary by Dr.

Cafferky showing GAF as 55). The higher score, as well as his lower scores, is consistent with

scores given by Lipp. Tr. 60 (Aug. 21, 2009 termination/discharge summary by Lipp showing

GAF as 35 at admission in 2007 and as 60 at termination in August 2009). Given that Dr.

Cafferky assessed Plaintiff's score at 55 at the time of discharge only a couple of days after

assessing her at GAF 30, and given that all of these scores were assessed before Plaintiff's alleged onset date, they are not "significant, probative" evidence that the ALJ was required to expressly reject. The ALJ did not err in failing to discuss Dr. Cafferky's lower GAF scores.

B. Counselor Arend

Arend saw Plaintiff at Cascadia beginning in December 2014 and continuing to March 2016. Tr. 770-807. On March 18, 2016, she wrote a letter on Plaintiff's behalf, describing Plaintiff as a current client. Tr. 809. Arend noted that Plaintiff's "most recent treatment episode" began in 2014 and that she had been Plaintiff's "primary clinician" since December 2015. *Id.*[1] Arend noted that Plaintiff was currently receiving individual therapy, case management, and medication management services at Cascadia. *Id.* She then wrote:

> Bernita reports experiencing challenges with mood stability including episodes of mania and depression. She experiences challenges to her motivation, energy level, and feeling fatigued. She reports feeling easily overwhelmed during interactions in the community. She also reports feeling anxious frequently in social situations and being preoccupied with worry related to others['] expectations. These symptoms impact her ability to complete tasks.

*Id.*

The ALJ discussed Arend's letter. Tr. 445. The ALJ found the statement "vague as to the extent of the impact on the claimant's ability to complete tasks[.]" *Id.* Further, Arend "did not offer any opinion on other areas of mental functioning." *Id.* The ALJ found that the "vagueness limits the weight given this opinion, but it was considered in limiting the claimant to simple work." Thus, the ALJ explained, "[s]ome but less than great weight is given to this statement as opinion evidence." *Id.*

---

[1] The progress notes indicate that Arend began working with Plaintiff in December 2014, not 2015. Tr. 770-807.

Plaintiff argues that the ALJ erred in giving Arend's opinion limited weight and failed to consider her treatment notes which, according to Plaintiff, did provide specific functional limitations which eliminated any finding of vagueness. I agree with Defendant that the ALJ did not err in her consideration of Arend's opinion.

Because she is neither a medical doctor nor a psychologist, Arend is an "other source" and not an acceptable medical source. 20 C.F.R. §§ 404.1513, 416.913; SSR 06-3p, available at 2006 WL 2329939. "Other source" opinion evidence may be rejected by offering a reason that is "germane" to the opinion. *Molina*, 674 F.3d at 1111. An ALJ may appropriately reject an opinion which is vague or conclusory, even under the stricter standards used for acceptable medical sources. *E.g. Pendley v. Colvin*, No. 6:13-cv-01945-JE, 2016 WL 1618156, at *9 (D. Or. Mar. 2, 2016) (ALJ not required to accept a physician's medical opinion that it is vague) (citing and quoting *Morgan v. Comm'r*, 169 F.3d 595, 600, 601 (9th Cir. 1999) (affirming an ALJ's discrediting of a physician's opinion because the opinion does not show how plaintiff's "symptoms translate into specific functional deficits which preclude work activity")), *adopted*, 2016 WL 1588396 (D. Or. Apr. 19, 2016); *Lynnes v. Colvin*, No. 6:13-cv-01874-AA, 2014 WL 6893685, at *5 (D. Or. Dec. 4, 2014) (ALJ properly rejected opinion of examining psychologist who gave vague description of limitations); *see also Bayliss*, 427 F.3d at 1216 (ALJ can reject physician opinion which is brief, conclusory, and unsupported); *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995) (ALJ did not err in rejecting treating physician's opinion that was conclusory because it had no specific assessment of functional capacity during the relevant time). If the vagueness or lack of functional specificity is a valid basis upon which to reject an acceptable medical source's opinion, it is a valid basis upon which to reject an other source's

opinion.

Here, Arend's letter offers only a vague description of "challenges" with mood stability, motivation, energy level, and fatigue. Tr. 809. References to "feeling overwhelmed" and "feeling anxious" in unspecified "social situations" are similarly nonspecific. *Id.* The opinion that her symptoms "impact her ability to complete tasks" fails to set forth specific functional assessments.

Moreover, the treatment notes Plaintiff asserts provide specific functional limitations do not actually do so. Defendant correctly describes the records cited by Plaintiff as a "generic list of the diagnostic criteria for bipolar disorder" contained within Arend's notes. Tr. 748, 756, 757. This is made clear by reading the entry in its entirety and noting its lack of any specific reference to anything particular to Plaintiff. Rather, it is a boilerplate list of symptoms and criteria for assessing bipolar disorder. The list also includes factors that have nothing to do with Plaintiff whatsoever. *Id.* (*e.g.*, "inflated self-esteem or grandiosity"; "Note: In children and adolescents, can be irritable mood"; "psychomotor agitation"). Because the only reasonable interpretation of these particular chart entries is that the references to marked limitations are not an actual assessment of Plaintiff's limitations, they do not provide the specificity lacking in Arend's opinion. The ALJ's determination that the opinion was vague was a reason germane to the opinion. Giving the opinion only some weight for support to a limitation to simple work was not error.

/ / /

/ / /

/ / /

30 - OPINION & ORDER

CONCLUSION

The Commissioner's decision is affirmed.

IT IS SO ORDERED.

Dated this _16_ day of _November_, 2017


_Marco Hernandez_
Marco A. Hernandez
United States District Judge